# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| NTA GRAPHICS SOUTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:16-cv-01158-SGC |
| | ) | |
| AXIOM IMPRESSIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER[1]

This is a dispute between two commercial printers, NTA Graphics South, Inc., and Axiom Impressions, LLC.  NTA Graphics commenced the action by filing a complaint asserting various state law claims against Axiom Impressions.[2]  Thereafter, Axiom Impressions filed a counterclaim asserting various state law claims against NTA Graphics.[3]  Federal subject matter jurisdiction is premised on diversity of citizenship. (Doc. 13 at ¶¶ 1, 3; Doc. 16).  Pending before the undersigned are two motions for summary judgment filed by NTA Graphics: one seeking judgment in its favor on certain of Axiom Impressions' claims (Doc. 53) and one seeking judgment in its favor on certain of its own claims (Doc. 55).  A hearing on the motions was held on July 23, 2019.  For the reasons discussed below, the first motion is due to be granted in part and denied in

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 9).

[2] NTA Graphics' amended complaint is the operative version of the pleading.  (Doc. 13).

[3] Axiom Impressions' third amended counterclaim is the operative version of the pleading. (Doc. 30).

part.  The undersigned orally denied the second motion in its entirety during the July 23, 2019 hearing and sets forth the reasons for so doing herein.

## I. Material Facts[4]

### A. Introduction

NTA Graphics and Axiom Impressions print newspaper advertising inserts and circulars.  (Doc. 55 at p. 2).  NTA Graphics' printing facility is in Birmingham, Alabama. (*Id.*).  Axiom Impressions has printing facilities in Portland, Tennessee and Liberty, Missouri.  (*Id.*).

On February 21, 2015, the roof of Axiom Impressions' Portland facility collapsed, causing a fire that rendered the facility and the four printing presses located inside unusable.  (*Id.*).  On February 25, 2015, Matt Duffield (Axiom Impressions' Chief Executive Officer) and Kevin Hendrix (Axiom Impressions' General Manager and Chief Operating Officer) met with Greg Klausing (NTA Graphics' President) and Rodney Parker (NTA Graphics' Vice President) to discuss whether NTA Graphics would be able to print jobs for Axiom Impressions pending remediation of the latter's Portland facility and repair of its equipment.  (*Id.*).[5]  At that time, the parties reached an oral agreement, the duration of which they did not contemplate would be equal to or in excess of one

---

[4] The following facts are undisputed, unless otherwise noted.  They are viewed in the light most favorable to Axiom Impressions, as the non-movant, with Axiom Impressions given the benefit of all reasonable inferences.

[5] Axiom Impressions claims Phillip Hales, an independent printing consultant, was also present at the February 25, 2015 meeting.  (Doc. 65-2 at p. 2; Doc. 54-4 at pp. 21-22).  NTA Graphics denies Hales was present at the meeting.  (Doc. 69-1 at ¶ 9).

year.  (*Id.*; Doc. 65-2 at ¶ 8).  The terms of that agreement and representations allegedly made during the February 25, 2015 meeting form the basis of this action.

**B. NTA Graphics' Performance**

The parties agree they contemplated NTA Graphics would print jobs for one of Axiom Impressions' customers, AG Florida, on a weekly basis and for other customers of Axiom Impressions depending on capacity at Axiom Impressions' Liberty, Missouri facility and NTA Graphics' Birmingham, Alabama facility.  (Doc. 53 at p. 7; Doc. 56-1 at ¶ 4; Doc. 65-2 at ¶ 7; Doc. 65-3 at pp. 74-75).  Axiom Impressions claims that during the February 25, 2015 meeting the parties discussed the approximate number of hours required each week to complete the AG Florida work, the schedule for that work, and expectations for print quality.  (Doc. 65-2 at ¶ 5).  According to Axiom Impressions, NTA Graphics represented it had the capacity to undertake the AG Florida work, and Axiom Impressions relied on this representation to the extent it would not have entered into an agreement with NTA Graphics absent such capacity.  (*Id.* at ¶¶ 5-6).  Nonetheless, there were occasions when NTA Graphics did not have enough labor to perform the AG Florida work, and Axiom Impressions had to send employees from its Portland facility to Birmingham, at its own expense, to help complete the work.  (*Id.* at ¶¶ 25-26).

What the parties refer to as the "Penn Dutch error" occurred when NTA Graphics included pages from a competing grocer's advertisement within the Easter advertisement for Penn Dutch, one of AG Florida's customers.  (Doc. 65-2 at ¶¶ 27, 29).  According to Axiom Impressions, this caused "tremendous" confusion amongst Penn Dutch's customers and came at a significant cost to Penn Dutch.  (*Id.* at ¶ 30).  AG Florida

seriously considered ending its business relationship with Axiom Impressions because of the Penn Dutch error. (*Id.* at ¶ 31). Axiom Impressions claims the Penn Dutch error also came at a cost to Axiom Impressions, for two reasons. First, AG Florida demanded Axiom Impressions provide a credit for the error in the amount of approximately $24,000, and Axiom Impressions complied with the demand for fear of losing AG Florida's business. (*Id.* at ¶ 31). Second, while Axiom Impressions had been planning to present AG Florida with a 5% price increase, it had to delay these plans because of the Penn Dutch error. (Doc. 54-3 at p. 66; Doc. 54-7 at pp. 20-21; Doc. 65-2 at ¶¶ 32-39; Doc. 65-18 at ¶¶ 3-6). Axiom Impressions did successfully implement price increases for five of its other customers in 2015 and 2016. (Doc. 65-2 at ¶¶ 42-46). Moreover, when Axiom Impressions finally did present a price increase to AG Florida on June 1, 2017, AG Florida accepted it. (*Id.* at ¶¶ 38-39). AG Florida accepted price increases on February 1, 2018, and May 1, 2018, as well. (*Id.* at ¶¶ 38-39).

### C. Axiom Impressions' Performance

Axiom Impressions provided paper for 95% of the jobs NTA Graphics printed on Axiom Impressions' behalf, the graphics for the jobs, and instructions for printing the jobs. (Doc. 54-3 at p. 29; Doc. 65-2 at ¶¶ 20-21).[6] Generally, paper is the most expensive commodity used by a printer, representing 40-50% of the cost of printing a job. (Doc. 65-2 at ¶ 22). By contrast, ink represents 4-5% of that cost. (*Id.* at ¶ 23).

---

[6] On occasions when NTA Graphics provided paper for jobs it printed on Axiom Impressions' behalf, it submitted separate invoices to Axiom Impressions for the paper. (Doc. 65-19; Doc. 65-2 at ¶ 20).

Moreover, the parties agree they contemplated Axiom Impressions would pay NTA Graphics for jobs it printed. However, they disagree on the payment terms.

Axiom Impressions has submitted sworn testimony that for a given job, it agreed to pay NTA Graphics a sum no greater than the amount Axiom Impressions billed its customer, less paper and freight provided by Axiom Impressions. (*See, e.g.*, Doc. 65-2 at ¶ 4; Doc. 54-4 at 22). NTA Graphics has submitted sworn testimony denying this was the parties' agreement. (Doc. 69-1 at ¶ 10). While NTA Graphics explains why it would not make business sense for it to have agreed to the price term articulated by Axiom Impressions (Doc. 53 at pp. 18-19), it does not propose an alternative price term to which the parties agreed. Instead, NTA Graphics essentially argues Axiom Impressions' conduct manifested its assent to amounts invoiced by NTA Graphics.

NTA Graphics regularly printed jobs for Axiom Impressions between February 28, 2015, and September 12, 2015. (Doc. 55 at p. 3). NTA Graphics submitted invoices totaling $309,885.96 to Axiom Impressions between April 2015, and either August or September 2015. (Doc. 56-1 at ¶¶ 6-7; Doc. 65-2 at ¶¶ 12-13; Doc. 69-1 at ¶ 4).[7] Axiom Impressions paid these invoices in full. (Doc. 56-1 at ¶¶ 6-7; Doc. 65-2 at ¶ 12; Doc. 69-1 at ¶ 4).[8] However, Axiom Impressions claims these payments do not indicate it had no objection to the amounts invoiced but, rather, merely that the discrepancies between the

---

[7] According to NTA Graphics, it submitted 13 invoices to Axiom Impressions between April 16, 2015, and August 18, 2015. (Doc. 69-1 at ¶ 4). According to Axiom Impressions, it received seven invoices from NTA Graphics in April 2015, and a few invoices in late August and/or early September 2015. (Doc. 65-2 at ¶¶ 12-13).

[8] NTA Graphics notes Axiom Impressions paid one of these invoices as late as October 13, 2015. (Doc. 56-1 at ¶ 6).

invoices and the corresponding invoices Axiom submitted to its customers were minimal and capable of resolution when it performed a final reconciliation at the conclusion of the parties' relationship.  (Doc. 65-2 at ¶ 12).

NTA Graphics submitted 88 or more invoices totaling $1,304,319.33 to Axiom Impressions between September or November 2015, and December 2015, for work performed during the course of the parties' business relationship.  (Doc. 56-1 at ¶¶ 6, 8; Doc. 65-2 at ¶ 13; Doc. 69-1 at ¶ 5).[9]  NTA Graphics concedes the invoices were late and claims this was because it was trying to keep up with the "torrent" of print jobs sent to it by Axiom Impressions.  (Doc. 53 at p. 12; Doc. 68 at p. 4).

Axiom Impressions made the notation "OK to pay" or "OK per KH" on a number of the invoices after receiving them.  (Doc. 59-1; Doc. 60-1; Doc. 61-1; Doc. 62-1). Hendrix testified he did not personally make the notation "OK per KH" on the invoices and that neither that nor any other mark or notation indicates the invoices were approved for payment.  (Doc. 65-2 at ¶ 11).  Rather, according to Hendrix, he noticed on receiving the invoices that the amounts NTA Graphics billed to Axiom Impressions were significantly different than the amounts Axiom Impressions billed its customers for the corresponding work.  (Doc. 65-2 at ¶ 14).  Hendrix testified he informed Parker that Hendrix needed to reconcile the invoices and this would take time given the volume of the invoices and time period they covered.  (*Id.*).  Moreover, according to Hendrix, fall is

---

[9]  According to NTA Graphics, it submitted 88 invoices to Axiom Impressions between September 14, 2015, and December 7, 2015.  (Doc. 69-1 at ¶ 5).  According to Axiom Impressions, it received approximately 100 invoices from NTA Graphics in November and December 2015, for print jobs performed as early as March 2015, and as late as September 2015. (Doc. 65-2 at ¶ 13).

the busy season for printers, which prevented him from devoting his full attention to the invoices at that time. (*Id.* at ¶ 15). Hendirx claims to have maintained regular communication with Parker during January, February, and March 2016, regarding the need to reconcile NTA Graphics' invoices to Axiom Impressions with Axiom Impressions' invoices to its customers. (*Id.* at ¶ 16).

NTA Graphics denies it had any communication with Axiom Impressions regarding invoicing discrepancies before March 14, 2016, when Hendrix sent an e-mail to Parker and Klausing, stating he planned to travel to NTA Graphics' Birmingham facility within the next two weeks "to go over invoicing differences." (Doc. 56-1 at ¶ 6; Doc. 56-4 at 14; Doc. 69-1 at ¶ 5).[10] NTA Graphics characterizes its e-mail exchanges with Axiom Impressions before March 14, 2016, either as indicating the latter would pay the former in full (Doc. 69-1 at ¶ 5), or as at least failing to object to the amounts invoiced. For example, on January 29, 2016, Klausing sent an e-mail to Duffield and Hendrix, stating he was extremely nervous about the sum Axiom Impressions owed NTA Graphics and needed to know when he could expect to receive payment. (Doc. 56-1 at ¶ 10). Klausing testified he never received a response to that e-mail. (*Id.*). On February 10, 2016, Klausing sent another e-mail to Duffield and Hendrix, stating he was entitled to know when NTA Graphics would receive payment on the outstanding invoices. (*Id.*). Klausing testified he never received a response to that e-mail, either. (*Id.*).

---

[10] Hendrix characterizes his March 14, 2016 e-mail as a reminder of invoicing discrepancies he had already raised. (Doc. 65-2 at ¶ 17).

On May 3, 2016, NTA Graphics received a wire transfer from Axiom Impressions in the amount of $749,005.82, together with a spreadsheet "reconciling" the invoices Axiom Impressions submitted to its customers for jobs printed by NTA Graphics with the invoices NTA Graphics submitted to Axiom Impressions for those jobs. (*Id.* at ¶ 11). NTA Graphics claims it is still owed $555,313.51 (together with interest at the rate of 18%) by Axiom Impressions (*id.* at ¶¶ 13-14), while Axiom Impressions disputes some portion of the balance owed (Doc. 56-4 at p. 28; Doc. 65-2 at ¶ 18).

### D. Claims

NTA Graphics asserts various state law claims against Axiom Impressions based on the latter's failure to pay the outstanding invoices in full. (Doc. 13). Axiom Impressions asserts counterclaims for breach of contract, based on NTA Graphics' alleged failure to submit timely and accurate invoices and the Penn Dutch error; breach of express and implied warranty, based on the Penn Dutch error; fraud, based on NTA Graphics' representations regarding its capacity to perform the AG Florida work; negligence; and unjust enrichment. (Doc. 30). In its pending defensive motion, NTA Graphics seeks summary judgment in its favor on all but Axiom Impressions' unjust enrichment counterclaim. (Doc. 53). In its pending offensive motion, NTA Graphics seeks summary judgment in its favor on only its claims for open account and account stated. (Doc. 55). The claims on which NTA Graphics seeks judgment are addressed below, with the exception of Axiom Impressions' negligence claim, which Axiom Impressions concedes. (Doc. 65 at p. 8 n.1).

### II. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial. *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248.[11] A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* at 248. If the evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted). All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

---

[11] The parties agree Alabama law governs their dispute.

**III. Discussion**

    **A. Axiom Impressions' Counterclaims**

        **1. Breach of Contract**

            **a. Statute of Frauds**

NTA Graphics argues Axiom Impressions' breach of contract claim fails because the parties' agreement was not in writing, as required by the statute of frauds contained in Alabama's Uniform Commercial Code (the "UCC"), Ala. Code § 7-2-201. (Doc. 53 at pp. 15-19). Axiom Impressions argues the statute of frauds contained in the UCC does not apply because the parties' agreement was one for the provision of services, not the sale of goods. (Doc. 65 at pp. 18-23). Instead, Axiom Impressions claims the validity of the oral agreement should be determined by reference to Alabama's general statute of frauds codified at Ala. Code § 8-9-2. (*Id.* at p. 23). Because that statute of frauds requires, in relevant part, contracts not to be performed within one year to be in writing, Axiom Impressions argues the oral agreement at issue is valid and its terms should be determined by the trier of fact based on parol evidence. (*Id.* at p. 23-25).

The UCC applies to contracts for the sale of goods. *See* Ala. Code § 7-2-102 (providing the UCC applies to "transactions in goods"); § 7-2-105 (defining "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."). It does not apply to contracts for the provision of services. *See* § 7-2-102. Courts have reached different conclusions as to whether a contract for printed materials is one for the sale of goods or the provision of services. *Compare A.P. Carrico & Son v. J.E. Duval Printing Co.*, 121 So. 59, 61 (Ala.

1929) (holding contract to print theater programs was one for "articles sold"); *Lake Wales Pub. Co., Inc. v. Florida Visitor, Inc.*, 335 So. 2d 335, 336 (Fla. Dist. Ct. App. 1976) (holding contract to print pamphlets and other materials was one for the sale of goods), *Gross Valentino Printing Co. v. Clarke*, 120 Ill. App. 3d 907, 910-11 (Ill. App. Ct. 1983) (holding contract to print magazines was one for the sale of goods), *Comark Merch., Inc. v. Highland Grp., Inc.*, 1990 WL 17115, at *7 (N.D. Ill. Feb. 8, 1990) (holding contract for production of brochures was one for the sale of goods), *aff'd*, 932 F.2d 1196 (7th Cir. 1991), *and Erin Printing and Promotional Mktg., Inc. v. Convum, LLC*, 2005 WL 366895, at *3 (Tenn. Ct. App. Feb. 15, 2005) (holding contract for production of catalogues was one for the sale of goods), *with Printing Center of Texas, Inc. v. Supermind Pub. Co., Inc.*, 669 S.W.2d 779, 782 (Tex. App. 1984) (holding contract to print books was one for the provision of services), *Duro Bag Mfg., Inc. v. Printing Servs. Co., Inc.*, 2010 WL 3586855, at *5 (S.D. Ohio Sept. 9, 2010) (holding contract to print components of shopping bags was one for the provision of services), *and Prestige Magazine Co., Inc. v. Panaprint, Inc.*, 2010 WL 4259398, at *3 (S.D. W. Va. Oct. 26, 2010) (holding agreement to print real estate guides was one for the provision of services).

The agreement between NTA Graphics and Axiom Impressions is best characterized as one for the provision of services.[12] The thoroughly reasoned, relatively

---

[12] Whether an agreement should be characterized as one for the sale of goods or the provision of services is a question for the jury only if "there is a true factual dispute, not if the division between goods and services merely involves a close call." *Duro Bag*, 2010 WL 3586855, at *4 (internal quotation marks omitted). NTA Graphics and Axiom Impressions do not dispute what

recent opinion issued by the Southern District of Ohio in *Duro Bag* informs this conclusion. In that case, a manufacturer of paper bags contracted with a retailer to produce a shopping bag bearing the retailer's artwork. *Duro Bag*, 2010 WL 3586855, at *1. Because the paper bag manufacturer did not have the capability to print the artwork with the requisite color and image specifications, it contracted with a printer to print sheets bearing the retailer's artwork that the manufacturer then converted into shopping bags. *Id.* Applying the "predominant purpose" test,[13] the court concluded the contract should be characterized as one for the provision of services because the manufacturer supplied the sheets, artwork, and color and image specifications to the printer, who agreed to provide the labor and other services necessary to re-produce the artwork to specification on the supplied sheets. *Id.* at 5. "[The printer] was not selling sheets it produced for buyers to make shopping bags, rather, it was rendering the service of

_____

goods and services were within their agreement but, rather, only the ultimate conclusion to be drawn from those facts. Accordingly, the characterization of the parties' agreement is a question of law for the court. *See id.* at *4-5 (concluding appropriate characterization of contract involving both goods and services was question of law for court because parties did not dispute what was in purview of agreement).

[13] In the case of contracts involving a combination of goods and services, the predominant purpose test asks "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974). Most courts apply this test to determine whether a "hybrid" contract should be characterized as one for the sale of goods or the provision of services. *See* 25 A.L.R. 7th Art. 4 (originally published in 2017) (noting characterization of hybrid contract is ordinarily determined by applying test first enunciated in "seminal" *Bonebrake* decision); *Rajala v. Allied Corp.*, 66 B.R. 582, 590 (D. Kan. Oct. 30, 1986) (collecting cases to support assertion majority of courts employ predominant purpose test when addressing hybrid contracts); *Kirkpatrick v. Introspect Healthcare Corp.*, 845 P.2d 800, 803 (N.M. 1992) (noting majority of jurisdictions apply predominant purpose test to characterize hybrid contract).

printing images on [the manufacturer's] sheets so that [the manufacturer] could fulfill its obligations to its own client." *Id.* "[T]he agreement . . . [was] for the manpower and machine capabilities to produce the specified impression on each sheet provided by the paper bag manufacturer. The only material supplied by [the printer] was the ink used to make the impression to [the retailer's] specification." *Id.* at *6.

Similarly, Axiom Impressions provided graphics and instructions for all of the jobs printed by NTA Graphics, as well as paper for 95% of the jobs. (Doc. 54-3 at p. 29; Doc. 65-2 at ¶¶ 20-21). Axiom Impressions looked to NTA Graphics to provide the printing press(es) and labor required to translate those raw materials into newspaper advertising inserts and circulars, so that it could fulfill its obligations to its customers while its Portland facility was offline.[14]

---

[14] Persuasive authority suggests the predominant purpose test determines how a hybrid contract is characterized under Alabama law. *See Skelton v. Druid City Hosp. Bd.*, 459 So. 2d 818, 824-25 (Ala. 1984) (Torbert, C.J., concurring specially) (suggesting predominant purpose test enunciated in *Bonebrake* should determine whether hybrid contract comes within scope of Alabama's UCC); *Scott v. Dixie Homecrafters*, 125 F. Supp. 2d 1311, 1313 (M.D. Ala. 2000) ("As a general rule, the Alabama Commercial Code applies to contracts for the sale of goods that also involve the ancillary provision of services related to those goods. In other words, if the contract is predominately for goods, with the incidental provision of labor and services, then the Code governs."); *Rigby v. FIA Card Services, N.A.*, 490 F. App'x 230, 234 n.2 (11th Cir. 2012) (noting Alabama's UCC was not dispositive of the question of acceptance of a hybrid contract because contract was comprised predominantly of services). However, the Alabama Supreme Court has not adopted the predominant purpose test or clearly articulated any test for characterizing a hybrid contract. *See Thorn's Diesel Serv., Inc. v. Houston Ship Repair, Inc.*, 233 F. Supp. 2d 1332, 1339-40 (M.D. Ala. Nov. 26, 2002) (declining to adopt predominant purpose test as Alabama's standard for determining whether a contract is for goods or services in the absence of direct authority from the Alabama Supreme Court). Nonetheless, the undersigned finds *Duro Bag* persuasive to the extent it addresses facts substantially similar to those that must be characterized in this case as evidencing an agreement for goods or an agreement for services. Moreover, the undersigned notes the parties concur their agreement involved both goods and

NTA Graphics argues the parties' agreement should be characterized as one for the sale of goods because it invoiced Axiom Impressions primarily on the basis of pages printed. (Doc. 66 at p. 3). While the manner in which a contract was billed is one factor courts may consider in characterizing a hybrid contract as one for the sale of goods or the provision of services, *see, e.g., BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1330 (11th Cir. 1998) ("[W]hen the contract price does not include the cost of services, or the charge for goods exceeds that for services, the contract is more likely to be for goods."), that factor is not persuasive here, *see Duro Bag*, 2010 WL 3586855, at *5 (finding per sheet billing system did not transform nature of contract from one for provision of services to one for sale of goods). This is especially true given NTA Graphics' invoices are at the heart of the parties' dispute.

NTA Graphics also argues the parties' agreement should be characterized as one for the sale of goods because a contract between Axiom Impressions and one of its customers refers to its purpose as the production of goods. (Doc. 66 at p. 4). While the language of the contract itself is another factor courts may consider in characterizing a hybrid contract as one for the sale of goods or the provision of services, *see, e.g., BMC Indus., Inc.*, 160 F.3d at 1330 ("[T]he language of the contract itself provides insight into whether the parties believed the goods or services were the more important element of their agreement."), that factor is likewise unpersuasive here. Notwithstanding the contract language quoted by NTA Graphics, in its own complaint and summary judgment

services and that the dispositive issue is which of these predominated. (Doc. 65 at pp. 18-23; Doc. 66 at pp. 1-4).

briefing, NTA Graphics repeatedly refers to "printing services" it performed for Axiom Impressions. (Doc. 13 at ¶¶ 8, 10-13, 15; Doc. 53 at pp. 3, 6, 12, 14, 18). Thus, at the very least, contract language is a neutral factor here. Given Axiom Impressions provided NTA Graphics with most of the raw materials used to print a job, a more accurate characterization is that NTA Graphics performed services for Axiom Impressions so Axiom Impressions could provide goods to its customers.

For the foregoing reasons, the agreement reached by NTA Graphics and Axiom Impressions is properly characterized as one for the provision of services.[15] Therefore, Alabama's general statute of frauds, not the statute of frauds contained in the UCC, determines whether the agreement was required to have been in writing. Alabama's general statute of frauds provides, in relevant part, that "[e]very agreement which, by its terms, is not to be performed within one year from the making thereof" is void unless in writing. Ala. Code § 8-9-2(1). "[T]o bring a contract within the purview of this section . . . the contract must be incapable of being performed within one year." *Hornady v. Plaza Realty Co., Inc.*, 437 So. 2d 591, 593 (Ala. Civ. App. 1983) (citing *Land v. Cooper*, 34 So. 2d 313 (1948)). Thus, even where an agreement is not likely to be performed within

_____

[15] As noted above, the Alabama Supreme Court held in a decision dating back to 1929 that a contract to print theater programs was one for "the manufacture and delivery of articles sold" and, therefore, "governed by the law of such transactions rather than the law of entire contracts for personal services." *A.P. Carrico & Son*, 121 So. at 61. In a supplemental brief filed after the July 23, 2019 hearing, Axiom Impressions argues the facts of this case are distinguishable from *A.P. Carrico & Son*. (Doc. 73). The undersigned agrees. To the extent there is no indication in *A.P. Carrico & Son* that the printer provided no more than the equipment and labor necessary to reproduce graphics and text supplied to it on paper also supplied to it, the undersigned finds the facts and reasoning of *Duro Bag* more on point.

one year or not expected to be performed within one year, it is not subject to § 8-9-2(1) unless "by a fair and reasonable interpretation of the terms used by the parties, and in view of all the circumstances existing at the time, [it] does not admit of its performance [within one year of its making,] according to its language and intention . . . ." *W.P. Brown & Sons Lumber Co. v. Rattray*, 192 So. 851, 855 (Ala. 1939); *see also Hill v. Raney Ins. Agency of Anderson, Inc.*, 474 So. 2d 738, 739-40 (Ala. Civ. App. 1985) (holding statute of frauds did not apply where there was no evidence parties agreed their dealings were to be performed over period exceeding one year and those dealings were capable of being performed, and were performed, within one year). NTA Graphics and Axiom Impressions did not contemplate their agreement was incapable of performance within one year from its making (Doc. 65-2 at ¶ 8), and NTA Graphics does not make an argument to the contrary. Accordingly, NTA Graphics' statute of frauds defense fails.

### b. Damages

Alternatively, NTA Graphics argues Axiom Impressions' breach of contract claim fails because Axiom Impressions cannot prove its damages. According to NTA Graphics, the AG Florida price increase Axiom Impressions claims to have delayed because of the Penn Dutch error constitutes lost profits that are not the proximate result of the breach complained of or reasonably ascertainable in amount. (Doc. 53 at pp. 19-23). Axiom Impressions argues these damages were foreseeable because NTA Graphics knew AG Florida was one of Axiom Impressions' most important customers and that it can prove the amount of these damages with reasonable certainty through the

introduction of testimony it had long-planned the price increase and expert testimony regarding the appropriate computation. (Doc. 65 at 27-31).

Special proof requirements apply to lost profits properly characterized as consequential damages. *Med Plus Props. v. Colcock Const. Grp., Inc.*, 628 So.2d 370, 376 (Ala. 1993).[16] These requirements are embodied in the rule of "reasonable certainty." *Id.* That rule requires that to be recoverable, lost profits must be (1) " 'the natural and proximate, or direct, result of the breach complained of'" and (2) either they must be " 'capable of ascertainment with reasonable, or sufficient, certainty,'" or there must be " 'some basis on which a reasonable estimate of the amount of the profit can be made.'" *Id.* at 376-77 (quoting *Paris v. Buckner Feed Mill, Inc.*, 182 So. 2d 880, 881 (Ala. 1966)). "[A]bsolute certainty is not called for or required." *Id.* at 377 (quoting *Paris*, 182 So. 2d at 881). However, to the extent lost profits are speculative, conjectural, or remote, they are disallowed. *Paris*, 182 So. 2d at 882.

Any lost profits Axiom Impressions suffered in connection with its decision to delay a price increase for AG Florida were not the proximate result of the Penn Dutch error. While Axiom Impressions may have known at the time the parties entered into their agreement that it planned to present a price increase to AG Florida, it did not communicate this intent to NTA Graphics, and the planned price increase was not made part of the parties' agreement. *See Garrett v. Sun Plaza Dev. Co.*, 580 So. 2d 1317, 1320 (Ala. 1991) ("[P]rofits are too remote and cannot be recovered when they are not the

---

[16] The parties agree the delayed price increase represents lost profits properly characterized as consequential damages. (Doc. 53 at pp. 22-23; Doc. 65 at pp. 27-31; Doc. 66 at pp. 5-6).

immediate fruits of the principal contract, but are dependent on collateral engagements not brought to the notice of the contracting parties."); *Dickerson v. Finley*, 48 So. 548, 552 (Ala. 1908) (holding plaintiff could not recover profits from contracts for sale of lumber of which he was deprived because of defendant's breach of agreement to furnish standing timber and sawmill, where plaintiff failed to allege sales contracts were within knowledge of defendant or contemplation of parties). The mere fact NTA Graphics knew AG Florida was one of Axiom Impressions' most important customers does not make the profits Axiom Impressions claims to have lost from delaying the AG Florida price increase foreseeable. The relevant question is not whether NTA Graphics had knowledge of the important business relationship between Axiom Impressions and AG Florida or whether Axiom Impressions had a definite intent to implement a price increase for AG Florida before the Penn Dutch error but, rather, whether the planned price increase was within NTA Graphics' knowledge or the contemplation of the parties' in reaching their agreement. It was not.

Moreover, attribution of lost profits to the Penn Dutch error amounts to no more than speculation, given Axiom Impressions never presented a price increase to AG Florida during the time at issue. AG Florida's serious re-consideration of its business relationship with Axiom Impressions following the Penn Dutch error may have led Axiom Impressions to believe AG Florida would have rejected a proposed price increase at or around the time of the error, but that belief was untested and, as such, is not a basis for awarding lost profits. *See Johnco Materials v. Conrad Yelvington Distribs.*, 542 F. Supp. 2d 1248, 1258 (M.D. Ala. 2008) (holding plaintiff's statement it intended to sell

byproducts of gravel to have been produced for defendant under allegedly breached supply agreement failed to provide evidentiary basis on which lost profits could be awarded); *Mall, Inc. v. Robbins*, 412 So. 2d 1197, 1201 (Ala. 1982) (holding tenant could not recover from landlord profits he might have realized by subleasing space to discotheque because such profits were dependent on future success of unestablished business and contingent on discotheque's continued ability to meet rental obligations); *Paris*, 182 So. 2d at 882 (holding profits party might have made by reselling eggs bought from feed mill that breached agreement were too speculative to be recoverable). Axiom Impressions' successful implementation of price increases for other of its customers in 2015 and 2016, and for AG Florida in 2017 and 2018, does not make it reasonably certain that but for the Penn Dutch error AG Florida would have accepted a price increase at an earlier date.

Accordingly, regardless of whether Axiom Impressions can provide a reasonably certain computation of the additional profits it would have earned if it had implemented a price increase for AG Florida earlier than June 1, 2017, it has failed to produce evidence NTA Graphics is legally responsible for these alleged lost profits. However, Axiom Impressions has produced evidence it suffered damages other than lost profits because of the Penn Dutch error – namely, the $24,188.01 credit it provided to AG Florida. (Doc. 65-2 at ¶ 31). Moreover, Axiom Impressions breach of contract claim is based not only on the Penn Dutch error, but also on NTA Graphics' alleged failure to submit timely and accurate invoices to Axiom Impressions. (Doc. 65 at p. 25). Therefore, while NTA Graphics' motion for summary judgment is due to be granted to the extent Axiom

Impressions cannot recover lost profit damages for the Penn Dutch error, Axiom Impressions' breach of contract claim otherwise survives.

### 2. Breach of Express and Implied Warranty

Axiom Impressions asserts claims for breach of express and implied warranty, premised on the warranties created by Alabama's UCC, Ala. Code §§ 7-2-313 and 7-2-314, in the alternative to its breach of contract claim. (Doc. 65 at pp. 31-32). As Axiom Impressions acknowledges (Doc. 65 at p. 31), the conclusion the parties' agreement is not governed by the UCC means that while its breach of contract claim survives, its breach of warranty claims necessarily fail.

### 3. Fraudulent Misrepresentation

Axiom Impressions claims it was fraudulently induced to enter into the parties' agreement by NTA Graphics' (1) misrepresentation it had enough labor to perform the AG Florida work and (2) suppression of the fact it did not have sufficient labor to perform that work. (Doc. 65 at pp. 33-36). NTA Graphics characterizes these claims as ones for promissory fraud and argues they fail because Axiom Impressions has not come forward with evidence NTA Graphics intended to deceive Axiom Impressions. (Doc. 53 at pp. 23, 25-26). It also argues the claims fail because they are based on the same conduct as Axiom Impressions' breach of contract claim. (*Id.* at pp. 23-25).

### a. Conduct Underlying Claims

The mere failure to perform a contractual obligation does not constitute fraud, and a breach of contract claim cannot be recast as one sounding in tort. *See Brown-Marx*

*Assocs., Ltd. V. Emigrant Sav. Bank*, 703 F.2d 1361, 1370-71 (11th Cir. 1983) (citing

*McAdory v. Jones*, 71 So. 2d 526, 528 (Ala. 1954)); *C&C Prods., Inc. v. Premier Indus.*

*Corp.*, 275 So. 2d 124, 130 (Ala. 1972). However, Alabama law permits maintenance of

both a claim a party fraudulently induced an agreement by misrepresenting or concealing

facts related to its ability to perform thereunder and a claim the party breached the

agreement by failing to perform thereunder. *See Combined Servs., Inc. v. Lynn Elecs.*

*Corp.*, 888 F.2d 106, 107 (11th Cir. 1989) (noting Alabama courts have "consistently

held" as much) (citing *Deupree v. Butner*, 522 So. 2d 242, 244 (Ala. 1988)); *Exxon Mobil*

*Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1129 (Ala. 2007)

(noting the "long-standing rule" that "[a] party who has been the victim of a

misrepresentation of a material fact or the suppression of a material fact when there is a

duty to speak upon which it reasonably relied *during negotiations* can claim fraud in the

inducement") (Lyons, J., concurring in part and concurring in result). What is required

for the simultaneous prosecution of such claims is that "the fraud claim [] be based on

representations independent from promises in the contract and [that it] independently

satisfy the elements of fraud." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 10-11 (Ala.

2004) (Houston, J., concurring specially) (citing *Deupree*, 522 So. 2d at 245); *see also*

*Muncher v. NCR Corp.*, 2017 WL 2774805, at *16-17 (N.D. Ala. June 27, 2017) (noting

that while Justice Houston's concurrence in *Hunt* is not binding it is nonetheless a

"correct statement[] of Alabama law").

Axiom Impressions' claims for fraudulent inducement by misrepresentation and

suppression satisfy this requirement. The basis for the claims is NTA Graphics' alleged

misrepresentation or concealment of its capacity to perform the AG Florida work. (Doc. 65 at pp. 33-36). Through briefing and oral argument, Axiom Impressions has clarified that contrary to NTA Graphics' interpretation, it does not allege any representation regarding NTA Graphics' capacity to perform the AG Florida work was made an obligation under the parties' agreement, or claim NTA Graphics breached a contractual obligation to provide sufficient labor to perform the AG Florida work. (*See* Doc. 65). Because the alleged conduct giving rise to Axiom Impressions' fraudulent inducement claims is independent from the conduct underlying its breach of contract claim, Axiom Impressions may maintain both the former and the latter in this action.

### b. Intent to Deceive

Legal fraud includes claims for the misrepresentation or suppression of *existing* material facts. *See* Ala. Code § 6-5-101 (providing misrepresentation of material fact constitutes legal fraud); Ala. Code § 6-5-102 (providing suppression of material fact constitutes fraud); *Baker v. Hanks*, 661 So. 2d 1155, 1157 (Ala. 1995) (noting fraudulent misrepresentation claim requires proof of false representation of *existing* material fact); *Coilplus-Alabama, Inc. v. Vann*, 53 So. 3d 898, 909 (Ala. 2010) (noting fraudulent suppression claim requires proof of concealment of *existing* material fact). By contrast, promissory fraud is based on a promise to act or refrain from acting in the future. *Sexton v. Bass Comfort Control, Inc.*, 63 So. 3d 656, 661 (Ala. Civ. App. 2010) (citing *Allstate Ins. Co. v. Hilley*, 595 So. 2d 873, 876 (Ala. 1992)); *see also New Hampshire Ins. Co. v. Flowers Ins. Agency*, LLC, 2011 WL 1740135, at *8 (M.D. Ala. May 5, 2011) (distinguishing between legal fraud and promissory fraud). The distinction is meaningful

because promissory fraud requires proof of intent to deceive, *Alabama Psychiatric Servs., P.C. v. 412 South Court Street, LLC*, 81 So. 3d 1239, 1247 (Ala. 2011) (citing *Pranzo v. ITEC, Inc.*, 521 So. 3d 983, 984 (Ala. 1988)), while legal fraud does not require fraudulent intent, *Burlington N.R. Co. v. Warren*, 574 So. 2d 758, 766-767 (Ala. 1990) (noting the court has long held misrepresentations are actionable even without fraudulent intent); *Davis v. Sterne, Agee and Leach, Inc.*, 965 So. 2d 1076, 1091 (Ala. 2007) (noting fraudulent suppression claim does not require proof of intent to deceive); *New Hampshire Ins. Co. v. Flowers Ins. Agency*, LLC, 2011 WL 1740135, at *8 (collecting authority).

According to Axiom Impressions, NTA Graphics' represented during the parties' February 25, 2015 meeting that it had the capacity to perform the AG Florida work. (Doc. 65-2 at ¶¶ 5-6). This was not a promise to act in the future but, rather, a statement of existing fact as to NTA Graphics' manpower. *Compare Alabama Psychiatric Servs.*, 81 So. 3d at 1246-47 (noting claim was one for promissory fraud where it involved alleged misrepresentations that addition to office building *would be built* as common area with sufficiently discreet and appropriate main entrance for plaintiff's clients), *with Sexton*, 63 So. 3d at 661-62 (holding statement was representation of present content of warranty plaintiffs were purchasing, not promise to act in future), *Hilley*, 595 So. 2d at 876 (holding statement was representation of insurer's present obligations under insurance policy plaintiff was purchasing, not promise to act in future), *and New Hampshire Ins. Co.*, 2011 WL 1740135, at *9 (holding statement was basis for claim of legal fraud, not promissory fraud, because it related to existing facts that were either true or false at the time it was made, not promise to act in future). Moreover, to the extent

that during the parties' February 25, 2015 meeting NTA Graphics concealed the fact it did not have sufficient manpower to perform the AG Florida work, such concealment also relates to facts as they existed at the time, not a promise to act in the future. Because Axiom Impressions asserts claims for legal fraud, not promissory fraud, it is not required to establish deceptive intent to succeed on those claims.

### c. Evidence Supporting Claims

The elements of a fraudulent misrepresentation claim are (1) a false representation (2) of existing material fact (3) relied on by the plaintiff, (4) who was damaged as a proximate result of the misrepresentation. *Baker*, 661 So. 2d at 1157. The elements of a fraudulent suppression claim are (1) the concealment of an existing material fact, (2) which the defendant had a duty to disclose, (3) and which induced the plaintiff to act or refrain from acting, (4) as a proximate result of which the plaintiff was damaged. *Coilplus-Alabama*, 53 So. 3d at 909. While a fraudulent misrepresentation claim does not require knowledge by the defendant of the falsity of its representation, *In re Bennitt*, 348 B.R. 820, 826 (Bankr. N.D. Ala. 2006) (citing *First Nat'l Bank of Auburn v. Dowdell*, 157 So. 2d 221, 225 (Ala. 1963); *Barrett v. Hanks*, 155 So. 2d 339, 342 (Ala. 1963)), a fraudulent suppression claim requires proof the defendant actually knew the fact alleged to have been suppressed, *Coilplus-Alabama*, 53 So. 3d at 909 (citing *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009)). Fraudulent inducement is a species of fraudulent misrepresentation or suppression where a party relies on a false representation or omission made during negotiations in executing an agreement or taking

a course of action.  *See Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000) (defining fraud in the inducement).

Axiom Impressions has submitted evidence that during the parties' February 25, 2015 meeting, NTA Graphics represented it had the capacity to perform the AG Florida work; that it relied on this representation in entering into the parties' agreement; and that it incurred extra expense because there were occasions when NTA Graphics did not have enough labor to perform the AG Florida work.  (Doc. 65-2 at ¶¶ 5-6, 25-26).  This evidence is sufficient to support its claim of fraudulent inducement by misrepresentation. As noted above, a misrepresentation need not have been made with intent to deceive. Under Alabama law, even innocent misrepresentations are actionable as fraud.  *See* Ala. Code § 6-5-101 ("Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.").  "The good faith of a party in making a representation that later proves to be false is immaterial; in the eyes of the law, the misrepresentation is as fraudulent as if it had been intentional." *Coaker v. Washington Cty. Bd. of Educ.*, 646 So. 2d 38, 42 (Ala. Civ. App. 1993) (citing *Smith v. Reynolds Metals Co.*, 497 So. 2d 93 (Ala. 1986)).  "Consequently, the mere assertion of that to be true which is not true, although believed to be true, when made to be relied on and which is relied on to the injury of a party misled thereby, may result in the imposition of liability for compensatory damages."  *In re Bennitt*, 348 B.R. at 826 (citing *Hudson v. Moore*, 194 So. 147, 149 (Ala. 1940); *Hartselle Real Estate & Ins. Co. v. Atkins*, 426 So. 2d 451, 453 (Ala. Civ. App. 1983)).

However, Axiom Impressions has failed to submit any evidence NTA Graphics actually knew at the time of the parties' February 25, 2015 meeting that it did not have the labor required to perform the AG Florida work, which is fatal to its claim of fraudulent inducement by suppression. Otherwise put, while NTA Graphics may have innocently misrepresented its capacity to perform the AG Florida work at the time the parties were negotiating the terms of their agreement, there is no evidence it concealed any knowledge it did not have the capacity represented.

## B. NTA Graphics' Claims

### 1. Open Account

The theory of an open account is a method of proving amounts owed. 1A C.J.S. *Account Stated* § 2. An open account is "an account under which the parties continue to do business, adding debits and credits, or a running account used by the parties to settle several transactions over an extended period." *Id.*; *see also Rose Manor Health Care, Inc. v. Barnhardt Mfg. Co.*, 608 So. 2d 358, 360 (Ala. 1992) ("[T]o establish an open account there must be an account based upon running or concurrent dealings, the dealings must not have been closed, settled or stated, and some term of the contract must remain to be settled between the parties, or the agreement must contemplate further transactions between the parties.") (internal quotation marks omitted). Proof of an account generally requires the plaintiff to reasonably satisfy the finder of fact of the amount due, and the defendant may contest the same. *See* 2 ALA. PATTERN JURY INSTR. CIV. 40.01 (3d ed.); *see also Car Center, Inc. v. Home Indem. Co., Inc.*, 519 So. 2d 1319, 1324-25 (Ala. 1988) (holding genuine issues of material fact regarding amount of debt owed precluded

summary judgment on open account claim).  Additionally, some courts have required a plaintiff asserting an open account claim to show the amount charged was reasonable. *See, e.g., De Groot v. Standley Trenching, Inc.*, 338 P.3d 536, 543 (Idaho 2014).

Given the amount Axiom Impressions owes NTA Graphics is at the heart of the parties' dispute, it is manifestly clear genuine issues of material fact preclude summary judgment in NTA Graphics' favor on its open account claim.  Moreover, the reasonableness of the outstanding invoices in this case remains an open question because NTA Graphics has failed to articulate the basis of the charges or clearly explain how and why they vary from Axiom Impressions' corresponding charges to its customers.

### 2. Account Stated

The theory of an account stated is another method of proving amounts owed.  1A C.J.S. *Account Stated* § 2.  "An account ceases to be an open account and becomes an account stated when the debtor assents to the balance stated."  *Id.*; *see also* 1A C.J.S. *Account Stated* § 17 ("The conversion of an open account into an account stated[] is an operation by which the parties assent to a sum as the correct balance due from one to the other . . . .").  The Alabama Supreme Court has relied on the Alabama Court of Civil Appeals' decision in *Univ. of S. Alabama v. Bracy*, 466 So. 2d 148 (Ala. Civ. App. 1985) for an explanation of the nature and elements of a claim for account stated.  *See Car Center*, 519 So. 2d at 1322-23 (quoting *Bracy*, 466 So. 3d at 150); *Stacy v. Peed*, 142 So. 3d 529, 532 (Ala. 2013) (quoting *Ayers v. Cavalry SVP I, LLC*, 876 So. 2d 474, 477 (Ala. Civ. App. 2003), in turn quoting *Bracy*, 466 So. 3d at 150).  In *Bracy*, the court explained:

An account stated is a post-transaction agreement. . . . A prima facie case on an account stated is made when the plaintiff proves (1) a statement of account between the parties is balanced and rendered to the debtor; (2) there is a meeting of the minds as to the correctness of the statement; and (3) the debtor admits liability. The debtor's admission to the correctness of the statement and to his liability thereon can be express or implied. An account rendered, and not objected to within reasonable time becomes an account stated, and failure to object will be regarded as an admission of correctness of the account."

466 So. 2d at 150 (internal citations omitted). "An implied agreement to pay a bill can arise only where there has been a showing that the bill was rendered and the recipient of the bill failed to object within a reasonable time." *Car Center*, 519 So. 2d at 1323.

Assuming the invoices NTA Graphics submitted to Axiom Impressions satisfies the first element of an account stated claim, genuine issues of material fact exist with respect to the second and third elements. The parties dispute whether Axiom Impressions unconditionally accepted invoices submitted by NTA Graphics between April 2015, and either August or September 2015, whether NTA Graphics was justified in the concededly late submission of the remainder of its invoices, and whether the parties communicated about the invoicing discrepancies alleged by Axiom Impressions before March 16, 2016. Resolution of these disputed facts is necessary to determine whether Axiom Impressions impliedly agreed to pay the invoices by failing to object to the same within a reasonable time. *See Bracy*, 466 So. 2d at 150 (holding that whether defendant's payment on bill for more than four years without objection constituted implied admission to correctness of, and liability for, bill was question for jury); *Owings v. Gullett*, 437 So. 2d 1050, 1052-53 (Ala. Civ. App. 1983) (holding plaintiff's denial he received defendant's letter objecting

to bill and plaintiff's failure to affirm he presented protest letter to plaintiff created questions of fact as to whether defendant failed to object to account within reasonable time).

## IV. Conclusion

For the foregoing reasons, NTA Graphics' defensive motion for summary judgment (Doc. 53) is **GRANTED** to the extent Axiom Impressions cannot recover lost profit damages for the Penn Dutch error and its claims for negligence, breach of express and implied warranty, and fraudulent inducement by suppression are **DISMISSED**. That motion is **DENIED** in all other respects. Additionally, NTA Graphics' offensive motion for summary judgment (Doc. 55) is **DENIED** in its entirety.

**DONE** this 3rd day of September, 2019.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE